**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| JOSE SERVIN, | ) | Case No. 16 B 39971 |
| | ) | |
| Debtor. | ) | Honorable Michael B. Slade |
| | ) | |

**MEMORANDUM OPINION**

Jose Servin seeks to reopen his chapter 7 case to pursue injunctive relief and sanctions

against Eagle Fence Distributing, LLC ("Eagle") for alleged violations of a discharge injunction.

Servin claims that Eagle has pursued him and his "after acquired property" to satisfy judgments

it obtained prepetition against Servin and his now-defunct business, Universal Fence & Decks,

Inc. ("Universal").[1]  Eagle opposes reopening the case, maintaining that Servin's request is

untimely, that his arguments were previously rejected in this chapter 7 case and in state court,

and that Servin's contentions misapprehend discharge law.[2]  Eagle denies that its activity targeted

Servin personally after 2020, when my predecessor granted in part an earlier motion by Servin to

enforce the discharge injunction and denied a motion for sanctions against Eagle.[3]  Rather, Eagle

submits, Servin "continues to conflate his personal capacity with that of the limited liability

companies he operated" (Eagle Resp. 1–2), erroneously alleging discharge violations where none

exist.  Given Servin's persistence in pressing what it alleges to be already-rejected arguments,

Eagle asks me to enjoin Servin from raising the same arguments going forward.  (*Id.* at 2)

---

[1]  *Debtor Jose Servin's Motion to Reopen Case Pursuant to 11 U.S.C. 350(b) & Rule 5010*, Dkt. No. 53 (hereinafter, "Motion to Reopen"); *Debtor Jose Servin's Reply to Eagle Fence's Objection/Response to Reopen Case*, Dkt. No. 58 (hereinafter, "Reply").

[2]  *Eagle Fence Distributing, LLC's Objection to Debtor Jose Servin's Motion to Reopen Case Pursuant to 11 U.S.C. 350(b) & Rule 5010*, Dkt. No. 54 (hereinafter, "Eagle Response").

[3]  *See* Dkt. Nos. 42 (Oral Ruling); 34 (Order).

1

I.

Section 350 of the Bankruptcy Code provides that a "case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). The statute is permissive and the "decision to reopen a bankruptcy case is within the broad discretion of the bankruptcy court." *Redmond v. Fifth Third Bank*, 624 F.3d 793, 798 (7th Cir. 2010). While bankruptcy courts do not have carte blanche, enforcement of the discharge is unambiguously one of the reasons that courts may, and do, reopen closed cases. *In re Zurn*, 290 F.3d 861, 864 (7th Cir. 2002) ("Section 350(b) allows a . . . judge to reopen a bankruptcy proceeding, but use of that power is reserved for matters such as the correction of errors, amendments necessitated by unanticipated events that frustrate a plan's implementation, and the need to enforce the plan and discharge." (internal citations omitted)).

This point merits emphasis because enforcing the discharge is crucial to the proper functioning of the bankruptcy system. In cases that are properly before me, I will strictly enforce the discharge injunction, whether it arises by statute, a confirmation order, or both. No former debtor should have to defend against a discharged claim—period. Willful violators will at a minimum be required to pay all of the discharged debtor's costs and attorneys' fees, and I will consider imposition of additional damages where appropriate, too. *See Taggart v. Lorenzen*, 587 U.S. 554, 557 (2019) ("[A] court may hold a creditor in civil contempt for violating a discharge order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct." (emphasis in original)); *In re Terrell*, 614 B.R. 300, 306 (Bankr. N.D. Ill. 2020) (ordering sanctions equal to the debtor's attorneys' fees). Every creditor should be on notice that violations of the discharge injunction will be punished—severely if and when severe sanctions are appropriate.

2

But while I anticipate typically granting motions to reopen bankruptcy cases to enforce the discharge when brought before me on a timely basis, a mere claim that a discharge injunction needs defending does not automatically open this court's doors. Instead, I must evaluate my jurisdiction to act and the facts and circumstances with an eye on achieving "substantial justice." *In re K R Realty & Inv., Inc.*, No. 12-34659, 2013 WL 3771444, at *3 (N.D. Ill. July 16, 2013) ("The decision to reopen a bankruptcy case is ultimately based on the court's equitable powers, and bankruptcy courts should avoid overly 'technical considerations that will prevent substantial justice.'") (quoting *In re Shondel,* 950 F.2d 1301, 1304 (7th Cir. 1991)).

The Seventh Circuit has identified three non-exclusive factors for bankruptcy judges to consider in evaluating motions to reopen: "(1) the length of time that the case has been closed; (2) whether the debtor would be entitled to relief if the case were reopened; and (3) the availability of nonbankruptcy courts, such as state courts, to entertain the claims." *Redmond*, 624 F.3d at 798. These factors balance two realities—first, that bankruptcy courts have expertise, both in the law governing bankruptcy cases and in the details of the cases before them, and second, that bankruptcy courts are courts of limited jurisdiction that exist parallel with other, often state courts, equally capable of addressing disputes. For that reason, the Seventh Circuit has emphasized that former debtors do not have "eternal access to federal court for all disputes related in some way to the debts handled in the bankruptcy proceeding." *Zurn*, 290 F.3d at 864. And the Seventh Circuit's jurisprudence over the past few decades is clear that a "debtor who has cause for reopening cannot dilly-dally." *In re Kleynerman*, 93 F.4th 1071, 1074 (7th Cir. 2024). "The passage of time weighs heavily against reopening. The longer a party waits to file a motion to reopen a closed bankruptcy case, the more compelling the reason to reopen must be." *Redmond*, 624 F.3d at 799.

II.

The long and tortuous history between these parties started in 2012, when Universal began obtaining fencing materials from Eagle on credit, which Servin personally guaranteed. (Compl. ¶ 8, *Eagle v. Servin*, Adv. Pro. No. 17-356 (Bankr. N.D. Ill. Jun 30, 2017), Dkt. No. 1) After Universal failed to pay the balance due, on July 1, 2015, Eagle obtained default judgments in state court against each of Universal and Servin for $107,010.39, plus costs (the "Judgments"). (Compl. Ex. A ¶ 3)  Eagle issued citations to discover assets, prohibiting Universal and Servin from transferring non-exempt property, and obtained turnover of $33,842.78 from Servin and Universal's bank account.  (Mot. Reopen Ex. 2)  But Servin's continued failure to appear in response to the citations led the state court to issue a show cause order and, ultimately, a body attachment order against Servin.  (Eagle Resp. 2; Compl. ¶ 14)  On the morning of his show-cause hearing, December 21, 2016 (the "Petition Date"), Servin sought relief under chapter 7 of the Bankruptcy Code.  (Dkt. No. 1; Compl. ¶ 16)  Universal, however, did not file for bankruptcy and was involuntarily dissolved by the Illinois Secretary of State two years later, in 2018.

Two months after the Petition Date, Servin formed a new business, Premier Fence, Inc. ("Premier"), which Eagle alleges is "located at the same address, using the same vehicles, and doing the same work as Universal."  (Reply Ex. B1, at 2)  On June 30, 2017, Eagle timely filed a complaint to determine dischargeability of the Judgment and object to Servin's discharge.  Eagle and Servin settled the matter in early 2018 via a repayment agreement in which Servin admitted the Judgment was non-dischargeable and agreed to satisfy it via installment payments (the "Settlement Agreement").  (Mot. Dismiss ¶ 9, *Eagle v. Servin*, Dkt. No. 21; Settlement Agmt. ¶¶ 1–2, *Eagle v. Servin*, Dkt. No. 26 at Ex. A)

To resolve the adversary proceeding, Eagle voluntarily dismissed its complaint with prejudice on March 23, 2018.  (Order, *Eagle v. Servin*, Dkt. No. 22)  From May 4, 2018 to September 5, 2019, Eagle received payments under the Settlement Agreement; however, according to the check images supplied by Servin, the payments were funded from a bank account held by Premier, rather than from Servin's personal cash.  (Mot. Reopen Ex. 9B)

Meanwhile, on July 6, 2017, the Clerk of the Court had entered a standard discharge order in the chapter 7 case.  (Dkt. No. 22)  And though the state court litigation was initially stayed on account of Servin's bankruptcy (Mot. Reopen Ex. 4B), by September 2017, Eagle restarted efforts to collect on its Judgments, including the one against Servin.  On September 13, 2017, Eagle obtained a citation targeted at Premier to discover assets and property belonging to Servin as well as Universal.  (Mot. Reopen Ex. 6)  On January 23, 2018, Eagle obtained an Order enforcing that citation, which did not limit the scope to Universal's property.  (Mot. Reopen Ex. 7C, at ¶ 3)  On May 13, 2019, after dismissal of Eagle's dischargeability complaint, the state court entered an order directing Eagle to report on whether sufficient legal grounds existed to attach the Judgment against Servin (among others) to Premier.  (Mot. Reopen Ex. 10A)  And finally, in October 2019, Eagle sought and was granted a citation targeted at Servin to facilitate collection of the Judgment against Servin following the cessation of payments under the Settlement Agreement.  (Mot. Reopen Exs. 12, 13A)

Servin then turned to this Court, moving for enforcement of the discharge injunction.  It is at this point that Eagle discovered it had made a procedural misstep in dismissing its adversary proceeding with prejudice, rather than obtaining entry of an agreed judgment order that set forth the terms of the Settlement Agreement, including most crucially, that the Judgment was non-dischargeable.  On March 16, 2020, my predecessor held that Eagle had missed its opportunity to

obtain a judgment of non-dischargeability with respect to the Judgment against Servin, and that

the Settlement Agreement did not qualify as a reaffirmation agreement.  (3/13/20 Hr'g Tr. 7:7-25,

Dkt. No. 41)  Therefore, Eagle had been attempting to collect a debt that had in fact been

discharged in Servin's bankruptcy pursuant to 11 U.S.C. § 524, and, on March 16, 2020, my

predecessor entered an order (the "2020 Enforcement Order") enforcing the discharge injunction

and barring Eagle "from collecting the prepetition debt of Jose Servin."  (Dkt. No. 34)

On August 11, 2020, Eagle filed a motion in state court seeking to attach the Judgment

against Universal to Premier, arguing that Premier is a successor entity to Universal that Servin

created only to avoid the Judgment against Universal.  (Reply Ex. B1, at 1)  That motion

disclosed the discharge of the Judgment against Servin in a footnote.  (*Id.* at n. 1)  Two months

later, Servin sought sanctions against Eagle in this Court, asserting that the motion violated the

discharge injunction and the 2020 Enforcement Order.  (Dkt. No. 36)

My predecessor denied that relief on October 30, 2020, explaining that the motion did not

violate section 524 because Eagle was seeking solely to collect the Judgment against ***Universal***

from Premier (and not to collect anything from Servin or to satisfy the Judgment against Servin

from any party), and the discharge Servin received personally did not extend to his businesses.

(10/30/20 Hr'g Tr. 2:18-25, 3:16-25, Dkt. No. 42)  Servin argued that Premier was shielded from

Eagle's crosshairs because he owned 100% of the company and Premier was formed

postpetition, ergo (in Servin's view) Premier and its assets were property of the estate and within

524's umbrella.  (10/30/20 Hr'g Tr. 3:8-10, 4:7-11)  My predecessor (correctly) explained,

however, that only Servin's shares in Premier constituted Servin's property; Premier's assets

belong to Premier and Servin has no direct ownership interest in any asset for which Premier

holds legal title.  (10/30/20 Hr'g Tr. 4:12-23, 6:2-9)  Premier's assets were available to Premier's

creditors and Eagle was free to pursue them under a successor liability theory.  11 U.S.C. §

524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or

the property of any other entity for, such debt.")  My predecessor also (correctly) rejected

Servin's attempt to argue that because he was the only human being controlling the transfers

from Universal to Premier, that meant his personal discharge injunction extended to the

companies he controlled.  (10/30/20 Hr'g Tr. 7:3-10)[4]

After the 2020 Sanctions Denial, the parties continued to actively engage in the state

court litigation.  From the papers provided, we know at least the following occurred:  On

January 12, 2021, Eagle filed a supplemental complaint against Premier (Reply Ex. C1) and

served the summons on Servin in his capacity as the Registered Agent for Premier.  (Reply Exs.

C2, C3)  Eagle also sought a temporary restraining order and moved for sanctions against Servin

and his counsel.  (*See* Reply Ex. D1)  Servin and Universal responded by filing a joint motion to

dismiss, which the state court denied on June 23, 2021.  (*See* Reply Ex. D1)  Servin then filed a

motion to claim exemptions in the proceeding (Mot. Reopen Ex. 15) and Servin, Universal, and

Premier jointly moved for reconsideration of the order denying the motion to dismiss. (*See* Reply

Ex. D1)  On August 4, 2021, the state court declined to reconsider its ruling and directed Premier

to answer the supplemental complaint.  (Reply Ex. D1)  The parties participated in significant

litigation over the next few years—the state court set a briefing schedule on the complaint, TRO

request, sanctions motion, and, it appears, various other pleadings filed by the parties; hearings

occurred through the remainder of 2021; discovery closed on March 31, 2023; and the state court

held a status conference on April 5, 2023 to set deadlines for dispositive motions and Servin's

---

[4]     *See also Order Denying for the Reasons Stated on the Record Motion For Sanctions for Violation of the Discharge Injunction*, Dkt. No. 40 (together with the October 30, 2020 oral ruling, hereinafter, "2020 Sanctions Denial").

May 2023 motion for state law exemptions.  (Reply Exs. D2, D3, D4, D5)  The docket from the

state proceeding (which no party provided to me, but I located from my own research) also

demonstrates *extensive* additional activity between May 2023 and August 2024.  *See docket*

*generally*, Eagle Fence v. Universal Fences, No. 15 L 169 (Ill. Cir. Ct.).

On November 21, 2024, Servin filed the Motion to Reopen, asking me to reopen the case

so that he can initiate an adversary proceeding seeking a determination of: (I) the extent of

Servin's discharge "in conjunction with" the dismissal of Eagle's dischargeability complaint and

the 2020 Enforcement Order as to Servin's "after acquired property," (II) whether Eagle and its

counsel should be sanctioned, (III) whether Eagle or their counsel are required to return "to Jose"

the funds paid pursuant to the Settlement Agreement, and (IV) whether Eagle and its counsel

unlawfully pursued Servin "from Dec. 21, 2016-March 13, 2020, March 20, 2020-Nov. 17, 2020,

[and] Jan. 12, 2021-present" in violation of the discharge injunction.  (Mot. Reopen 20)

III.

Under *Redmond*, in evaluating Servin's Motion to Reopen, I am to consider "(1) the

length of time that the case has been closed; (2) whether the debtor would be entitled to relief if

the case were reopened; and (3) the availability of nonbankruptcy courts, such as state courts, to

entertain the claims."  624 F.3d at 798.  While (as described above) in most cases I welcome

requests to enforce the discharge injunction and will typically reopen bankruptcy cases to do so,

here all of the factors weigh heavily against Servin.

First, I need to reiterate what the Seventh Circuit made clear last year: a "debtor who has

cause for reopening cannot dilly-dally." *Kleynerman*, 93 F.4th at 1074.  This case has been

closed for at least four years since the last fight, and it has been over seven years since the

discharge was issued and the case was closed.  Courts in this circuit routinely decline to reopen

8

cases where the movant waited to seek relief.  *See e.g.*, *In re Bianucci*, 4 F.3d 526, 527, 529 (7th Cir. 1993) (waiting 2 years after the case was closed and 5 months after debtors had actual knowledge of the issue was "an inordinate length of time"); *McGarry & McGarry LLC v. Integrated Genomics, Inc.*, No. 17-CV-08745, 2018 WL 4699779, at *2 (N.D. Ill. Sept. 30, 2018) (debtor delayed "more than a year after it knew about the claim"); *Brown v. UAL Corp. (In re UAL Corp.)*, 809 F.3d 361, 363–64 (7th Cir. 2015) (delay was between 2.5 and 6 years, depending on which triggering incident one counted from); *Imler v. Combs-Skinner*, 465 F. App'x 552, 553–54 (7th Cir. 2012) (5-year delay); *Redmond*, 624 F.3d at 799 (7-year delay); *compare Kleynerman*, 93 F.4th at 1074 (debtor waited only 36 days).  In considering whether too much time has passed, courts consider whether reopening "risks prejudice to the nonmovant," such as by rendering wasted legal fees incurred during the delay.  *Smith v. Kleynerman*, 647 B.R. 196, 202–03 (E.D. Wis. 2022) *aff'd sub nom. Kleynerman*, 93 F.4th 1071; *see also McGarry & McGarry LLC v. Integrated*, 2018 WL 4699779, at *2 ("This delay also came at a price to BMS, as it had to defend itself against several lawsuits brought by McGarry.").

Here, nearly four years elapsed after the ***most recent*** activity that Servin complains about—Eagle recommencing efforts in early 2021 to collect the Universal Judgment from Premier's assets—before Servin brought the Motion to Reopen.  If Servin truly believed that continuation of that effort constituted a discharge violation (notwithstanding my predecessor's comments in the 2020 Sanctions Denial), then he should have sought this Court's assistance promptly upon receiving service of Eagle's supplemental complaint in January 2021.  Instead, Servin engaged in four years of robust litigation in state court, evidenced by the voluminous documents Servin appends to his papers and the numerous additional pleadings referenced therein and on the docket.  In the years during which Servin delayed seeking the enforcement of

9

the injunction he now claims to need, Eagle asserts (and I have every reason to believe) that it expended substantial time and money in such active state court litigation.  (Eagle Resp. at 7). Parties who defend allegedly discharged claims in state court for years and then turn to me for assistance enforcing the injunction will rarely succeed.

Servin does not identify any incident more recent than January 12, 2021 that would constitute a distinct injunction violation, separate from the general continuation of collection efforts against Premier (which, as described below, is not a violation of the injunction at all).  *Cf. Kovacs v. U.S.*, 614 F.3d 666, 676 (7th Cir. 2010) (each IRS attempt to collect discharged taxes was a "discrete act rather than a continuing violation").  The delivery of checks to Eagle under the Settlement Agreement ended in 2019—*five* years before Servin filed this motion.  And Servin says that if I agree to reopen the bankruptcy case, he intends to challenge (or re-challenge) Eagle's and its counsel's activity going as far back as the December 21, 2016 Petition Date— *eight* years prior to the filing of this motion. (Mot. Reopen 20)

Servin's proffered explanations for his delay are unpersuasive.  Servin points to COVID-19 restrictions lasting through the spring of 2022 (Reply 8), but practice in the bankruptcy courts did not come to a halt during that time (and in fact saw an extraordinary level of activity).  While the pandemic could perhaps justify a delay of a few months, it does not justify waiting years, and indeed by Servin's own accounting the pandemic's impact ended by mid-2022, a full two years before Servin sought relief.  He also mentions changing lawyers, but Servin's current counsel has been filing papers on Servin's behalf since 2020 (the same counsel signed the October 25, 2020 motion for sanctions).  While the health issue identified by counsel would also justify some delay, it took place two years prior to seeking relief, in 2022 (at which point Servin should have already sought relief with respect to the supplemental complaint filed in

January 2021 if he believed it to be a violation), and, again, Servin himself states it was responsible for only "a few months" of delay.  (Reply 9)  While Servin points to papers filed in 2021 and various litigation that occurred in the intervening years, none of the pleadings, discovery, or judge changes impeded Servin's ability to seek redress here—to the contrary, each one compounded Servin's neglect in waiting to seek relief.

Servin's delay suggests that filing the Motion to Reopen now is a litigation tactic. *Compare Redmond*, 624 F.3d at 799 (the timing of the filing of the motion to reopen (right before trial) suggested that it was a "stalling tactic to delay" the state court proceeding).  If Servin hopes I will be more receptive to his substantive arguments on the scope of the discharge injunction than my predecessor was, he is mistaken.  Perhaps more on point, debtors that chose to litigate in another forum for years and then seek refuge here because they do not like the results are not going to find this Court a panacea.  Servin has not adequately justified the multi-year tardiness in coming back to these doors and, therefore, Servin's dilatoriness is "in itself a sufficient basis to deny the Motion to Reopen."  *In re Imler*, No. 02-90582, 2011 WL 240469, at *2 (Bankr. C.D. Ill. Jan. 24, 2011), *aff'd sub nom. Imler v. Combs-Skinner*, No. 11-CV-2117, 2011 WL 3678906 (C.D. Ill. Aug. 23, 2011), *aff'd*, 465 F. App'x 552.

IV.

While reopening a closed bankruptcy is a procedural maneuver that (even when granted) has no substantive impact on any party's claims or defenses, the second *Redmond* factor (whether the debtor could obtain the relief he seeks) requires me to pre-judge the merits of the case the debtor wants to pursue.  The Seventh Circuit cautions that "a closed bankruptcy proceeding should not be reopened where it appears that to do so would be futile and a waste of judicial resources."  *Redmond*, 624 F.3d at 803 (internal quotation mark omitted); *see also In re*

11

*Antonious*, 373 B.R. 400, 405–06 (Bankr. E.D. Pa. 2007) (a court should consider whether "it is clear at the outset that the debtor would not be entitled to any relief if the case were reopened"). As I advised the parties at the status conference on February 5, 2025, I view this threshold as similar to the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6):  it is passed where the complaint alleges facts sufficient to support a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *cf. Spencer v. PNC Bank, N.A.*, No. 13-cv-369-bbc, 2013 WL 5563999, at *2 (W.D. Wis. Oct. 8, 2013) ("Before a bankruptcy court is required to upset settled expectations and reopen a case that has been closed for more than two years, at the least the debtor must make a showing that she will be able to obtain the relief she seeks.").

Servin's Motion to Reopen previews the four issues he hopes to pursue in an adversary proceeding: (I) determining the scope of the discharge injunction as it relates to "after acquired property," (II) determining whether Eagle and its counsel should be sanctioned, (III) determining whether the payments made pursuant to the Settlement Agreement should be returned "to Jose [Servin]," and (IV) whether Eagle pursued Servin "individually" between the Petition Date and present in violation of the discharge injunction.  None of these issues satisfies the low bar described above.

As a threshold matter, as Eagle points out, many of these issues were already determined in the chapter 7 case by my predecessor, and I am precluded from revisiting them by the law-of-the-case doctrine.  *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (stating that the law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022) ("When a case is transferred between . . . judges midway through litigation, the doctrine discourages the new judge from reconsidering

rulings made by the original judge.").  In rendering the 2020 Sanctions Denial, my predecessor

explained that the property Servin argues is his "after acquired property" protected by the

discharge is not, in fact, Servin's property at all and is not protected by the discharge.[5]  Not only

is this the law of the case not subject to revisiting now, but it is also black-letter law.  *People v.*

*Doerk*, 376 Ill. 644, 647–48 (1941) (in upholding a conviction for embezzlement, the Illinois

Supreme Court said that an officer of the company "was not the corporation," "had no right to

misappropriate and convert to his own use the property of the corporation," and could not confer

that right on others); *Laura Farmers Co-op. Elevator Co. v. U.S.*, 273 F.Supp. 1019, 1022 (S.D.

Ill. 1967) (shareholders "are not the owners in any legal sense of any part of the corporation's

property").  To be clear, while Servin may have owned 100% of the shares in Universal and in

Premier, any interest he had in Universal's and Premier's property (such as cash, vehicles, tools,

revenues from customer contracts) was subordinate to those company's creditors' claims and

subject to clear legal restrictions on realizing those interests.

Servin's descriptions of his transfers of Universal property to himself and to Premier are

difficult to follow, but to the extent Servin is attempting to argue that, because he transferred

Universal's corporate property to himself and then to Premier prior to Universal's state law

dissolution in 2018 (Mot. Reopen 16; Reply 4–5),[6] such property magically became estate

---

[5]   Servin repeatedly refers to his "after acquired property," which appears to be a reference to section 524(a)***(3)***
      (the discharge "operates as an injunction against the commencement or continuation of an action, . . . or an act,
      to collect or recover from, . . . property of the debtor  . . . that is acquired after the commencement of the case,
      ***on account of any allowable community claim***" (emphasis added)).  This subsection solely addresses situations
      where one spouse has received a discharge, the other has not, and there is a ***community claim***.  As no party has
      alleged that Servin's wife is personally liable on the Judgments, subsection (a)(3) is inapplicable.  (Moreover,
      for the same reasons that Universal's and Premier's property are not Servin's property, they are also not his
      wife's property.)  Property owned by the businesses are property of the businesses.

[6]   In the Reply, Servin quotes his own Individual Declaration of State Law Exemptions filed in the state court
      litigation:  "All property acquired by Premier Fence, Inc., since I formed Premier Fence, Inc. on Feb. 22, 2017,
      including any and all personal property I acquired from Universal Fence, Inc. prior to [the Petition Date]."
      Reply 5 (quoting Mot. Reopen Ex. 15).

13

property forever protected by the discharge injunction, he is incorrect. *See Fowler v. Shadel*, 400 F.3d 1016, 1018 (7th Cir. 2005) (noting that the debtor's shares in his business became property of the estate and that only the bankruptcy trustee (and not the debtor) would have been able to obtain legal ownership of that business' assets, but only after liquidating the business in accordance with Wisconsin law). Moreover, that statement seems to be a troubling admission of misconduct, including embezzling from his own company, violating the state court citations' prohibition on transfers, illegally transferring estate assets to a non-debtor, and committing perjury on his sworn schedules of assets (*i.e.*, bankruptcy fraud).

Even if I could revisit my predecessor's ruling, I would reach the same decision. Servin, by his own admission (Mot. Reopen ¶¶ 13, 14, 36 & pp. 15–16), regularly failed to respect corporate formalities, but that reality is not one that Servin can rely on for his own benefit. Treating his businesses' assets as his own does not legally make those assets his. (And if it did, the Universal assets Servin transferred to himself would have been available to satisfy Servin's creditors in the chapter 7 case, and Servin would have been barred under multiple sections of the Bankruptcy Code from transferring them to Premier.) Servin's argument attempts to turn basic principles of veil piercing/alter ego on their head to achieve a "substantial consolidation" between himself and his companies to benefit from a wider discharge injunction, without the attendant burden of administering consolidated liabilities. But my predecessor already rejected that effort, and I see the issue the same way. Therefore, there is no possibility Servin could obtain relief with respect to Issue I.

Similarly, my predecessor already dispensed with Issues II and IV with respect to events that occurred in and before 2020. The Motion to Reopen spills much ink rehashing Eagle's conduct that was the subject of the prior 2020 Enforcement Order and 2020 Sanctions Denial.

14

My predecessor already ruled in Servin's favor in part, finding that in light of Eagle's failure to obtain a judgment that the Judgment against Servin was non-dischargeable, Eagle's conduct in pursuing Servin personally in state court prior to 2020 did violate the section 524 injunction. Servin is not permitted to seek a redundant ruling on the same claim for the same conduct—nor would one have any practical effect. In the same vein, my predecessor already ruled that Eagle's subsequent efforts to pursue Premier for the Judgment against United did not violate the section 524 injunction. In connection with the latter dispute, Servin sought sanctions and punitive damages for Eagle's conduct going back to March 23, 2018, which covered **all** the conduct my predecessor held to be violative of the discharge injunction. (Dkt. No. 35, at 6). My predecessor declined to impose sanctions. Therefore, Issues II and IV have already been determined as they relate to any conduct prior to October 30, 2020, and were Servin to include that conduct in an adversary complaint on these issues now, those claims would be dismissed as precluded.[7]

What remains of Issues II and IV—*i.e.*, conduct that occurred after the 2020 Sanctions Denial—is premised on the same misapprehension about the issues that Servin already lost when he previously raised Issue I. Because my predecessor already ruled (correctly) that seeking to collect the Judgment against Universal from Premier's assets does not violate section 524, Eagle's subsequent actions to pursue that same collection also cannot violate the discharge injunction. Indeed, neither Servin's papers nor his counsel during argument on February 5, 2025 (after I specifically asked him if he could do so) identified any action that Eagle took after the 2020 Enforcement Order that was directed at Servin in his personal capacity or at his personal

---

[7]   *Cf. In re Imler*, 2011 WL 240469, at *2 ("In their Motion to Reopen Bankruptcy, the Debtors appear to be attempting to undo the Judgment entered in the United State [sic] District Court for the Central District of Illinois, in February 2003, in Case No. 01–2013. The reopening of the Debtors' bankruptcy proceeding will not afford the Debtors the relief they seek. The Judgment of the United States District Court, in Case No. 01–2013, is final, and there is nothing that the Bankruptcy Court can do to overturn the District Court's decision.").

assets (including, specifically, any attempts to foreclose on Servin's shares in Premier).

Therefore, Servin has failed to identify an action since my predecessor's last ruling that could

conceivably constitute a violation of the discharge injunction.  There is thus nothing for which I

can impose sanctions.  *See In re Archdiocese of Milwaukee*, 663 B.R. 897, 918 (Bankr. E.D. Wis.

2024) ("In sum, even if the case were to be reopened, the State points to no legal authority for

the relief it seeks, which is reason enough to conclude that it is not entitled to that relief."); *see

also Imler v. Combs-Skinner*, 2011 WL 3678906, at *4 (denying a motion to reopen where

debtors challenging their attorney's fees pointed to his recent entitlement to disability benefits,

but the disability was respiratory issues, which had "no conceivable bearing" on the award of

attorney's fees granted "many, many years ago").  Servin has not shown it would be possible to

obtain the relief he seeks with respect to Issues II and IV.

Finally, regarding Issue III, Servin hopes to claw back the payments made pursuant to the

now-invalidated Settlement Agreement.  But Servin gets tripped up on corporate formalities here

again.  Servin states that Eagle collected the Settlement Agreement payments from "Jose

individually" (Mot. Reopen ¶ 39), but according to the evidence Servin himself offers—copies of

the checks to Eagle—the payments were made from a Premier bank account, and ***not*** from

Servin in his individual capacity. (Mot. Reopen Ex. 9B)  Because Servin did not make the

payments from his own funds, he is unlikely to prevail in arguing that, in the event Eagle is

obligated to refund what they received, the returned money should go to him over Premier.

Premier's cash funded the payments, so any action to recover those amounts belongs to Premier.

*Mann v. Kemper Fin. Companies, Inc.*, 247 Ill. App. 3d 966, 974–76 (1992).[8]  Until last year

---

[8]  The Appellate Court of Illinois regularly quotes the Third Circuit in *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970) when noting the "general rule" regarding shareholder standing:

> A stockholder of a corporation does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the

Servin, in his capacity as Premier's officer, likely could have directed Premier to pursue such an action against Eagle in a court of competent jurisdiction, but Premier's own bankruptcy (filed in 2024) has now vested exclusive standing to bring that action in Premier's chapter 7 trustee as part of administering Premier's chapter 7 case. *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) ("[T]he trustee has the sole responsibility to represent the estate, by bringing actions on its behalf to marshal assets for the benefit of the estate's creditors."). Servin has done nothing in his motion to suggest that he would have standing to bring the claim he seeks to bring, and thus it is clear from the outset that Servin would not be entitled to a recovery in connection with Issue III.

In sum, so that there is no continuing misunderstanding, while the Judgment against Servin, personally, was discharged and Eagle is not permitted to pursue either (a) satisfaction of that Judgment or (b) satisfaction of the Judgment against Universal from Servin's ***personal*** assets (*i.e.*, property he owns in his own name), the Judgment ***against Universal*** is separate and distinct, it was never discharged, and Eagle is free to attempt to collect on that Judgment in any way it can under applicable law.[9] That includes pursuing successor liability against Premier, though now Eagle must operate within the strictures of the Bankruptcy Code in light of Premier's chapter 7 case (where, I note, the deadline to file claims is rapidly approaching).

---

shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of corporate assets. In this situation, it has been consistently held that the primary wrong is to the corporate body and, accordingly, that the shareholder, experiencing no direct harm, possesses no primary right to sue.

*Davis v. Dyson*, 387 Ill. App. 3d 676, 691 (2008) (calling this the "general rule" regarding standing to pursue claims for harms to a corporation); *Mann v. Kemper Fin.*, 247 Ill. App. 3d at 975–76.

[9] Given the water under the bridge on this point, Eagle asks me to "enjoin" Servin from making future arguments about the scope of the discharge. (Eagle Resp. 2) Eagle's request is improper for a number of reasons, including that it is a request for relief only made in a response brief, would need to be part of an adversary proceeding, *see* Fed. R. Bankr. P. 7001(7), and might violate the First Amendment to the U.S. Constitution. That request is denied.

17

V.

Given his long delay in seeking relief, Servin needed to have a particularly compelling reason for me to reopen his case. *Redmond*, 624 F.3d at 799 ("The longer a party waits to file a motion to reopen a closed bankruptcy case, the more compelling the reason to reopen must be."). But a review of his papers reveals instead that he has *no* grounds for relief. Because I believe that Servin waited far too long to seek relief for the violations of the discharge injunction that he alleges, and I do not see any viable potential claims in any event, I do not need to weigh whether there is an appropriate alternative forum in which Servin could bring those claims.

As described above, I am inclined to almost always reopen a bankruptcy case where the question prompting the request to reopen is whether or not a debtor's discharge injunction has been violated. But this matter presents the (hopefully rare) instance where the movant waited many years after the alleged violations before seeking relief, and where the movant's pleadings and argument on the record do not plausibly articulate a basis on which I could find that a violation has occurred or that the debtor might be entitled to the relief he seeks to pursue. Thus, applying the *Redmond* factors, Servin's Motion to Reopen will be denied. I will issue a separate order making that clear.

Signed:   March 18, 2025          By:

MICHAEL B. SLADE
UNITED STATES BANKRUPTCY JUDGE

18